**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 30 2001**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

    Plaintiff-Appellee,

v.

ARIEL ABUSTAN ASIDO,

    Defendant-Appellant.

No. 00-3194

(D.C. No. 99-CR-10151-MLB)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **KELLY**, **BALDOCK**, and **LUCERO**, Circuit Judges.

Defendant Ariel Abustan Asido entered a conditional plea of guilty to possessing marijuana with intent to distribute in violation of 21 U.S.C. § 841(a)(1). See Fed. R. Crim. P. 11(a)(2). Defendant reserved his right to appeal the district court's denial of a motion to suppress evidence of marijuana found in a vehicle he was driving. According to Defendant, the evidence resulted from an unlawful stop, detention, and search of his person. The district court sentenced Defendant to thirty-seven months imprisonment. Defendant now appeals the district court's denial of his motion to suppress. We exercise

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742. We affirm in part and remand for further fact-finding.

I.

At the suppression hearing, Kansas Highway Patrol Trooper Doug Rule first testified that around 10:00 a.m. on November 13, 1999, he, together with Trooper Richard Jimerson, observed Defendant driving a 1992 Mercury Marquis east on Interstate 70 near Hays, Kansas. As he followed Defendant, Trooper Rule observed Defendant's vehicle drift over the right shoulder once then almost hit the center line before straightening out. The trooper observed no weather or road conditions to account for the vehicle's erratic movement. The trooper also noticed Defendant's North Carolina license plate was partially obstructed with a black tag cover that encircled the registration plate. Despite the partial obstruction, Trooper Rule was able to read the license number and determine the state of origin.

Trooper Rule activated his lights and stopped Defendant. Trooper Rule approached the vehicle from the passenger side, informed Defendant he was drifting, and requested his driver's license. When Trooper Rule asked Defendant if he was sleepy, Defendant replied he was not. Defendant explained that his car pulled to the right. Defendant produced a California driver's license. He also produced a vehicle registration and informed the trooper that his uncle owned the vehicle. In response to the trooper's questions, Defendant stated he was traveling from Tucson, Arizona to North Carolina to

2

return the vehicle to his uncle. Defendant told the trooper that his uncle had accompanied Defendant on the trip until they reached New Mexico, at which point his uncle became ill and flew home. Trooper Rule noted that Interstate 40, not Interstate 70, provided the shortest route between Arizona and North Carolina. Trooper Rule observed a small duffel bag in the back of the vehicle in addition to some shirts hanging up in the rear of the vehicle on the driver's side.

During the encounter, Trooper Rule noticed that Defendant was extremely nervous. Defendant's hands were shaking and he appeared to be breathing rapidly. Trooper Rule returned Defendant's license and registration and issued him a warning citation. The trooper told Defendant that was all he "had for him." The trooper then asked if he could briefly question Defendant further. Defendant agreed. Trooper Rule asked Defendant if he was carrying anything illegal such as drugs, guns, or large amounts of currency. Defendant said no. Next, Trooper Rule asked Defendant if he could search the trunk of the vehicle. Defendant stated he did not have a key to the trunk. Trooper Rule asked Defendant if he could search the interior of the vehicle. Defendant consented.

At that point, Trooper Jimerson, who had remained in the patrol car, approached Defendant's vehicle. Trooper Rule asked Defendant to step out of the vehicle. Trooper Jimerson patted Defendant down for weapons. Both troopers searched the vehicle's interior and found nothing illegal. The interior trunk release mechanism was locked. Neither trooper found a key to the trunk inside the vehicle. In response to further

3

questioning, Defendant again denied possessing a key to the trunk. Trooper Jimerson testified that he next asked to search Defendant's pants pockets for a key. Defendant again consented. Trooper Jimerson searched Defendant's pockets but still did not find a key to the trunk. Trooper Jimerson testified that in his twelve years of experience, a driver's lack of access to a vehicle's trunk indicated the likely presence of contraband:

> Q. What is there about him not having a key to the trunk and the trunk being locked and the remote lock on the interior of the car being locked to make you think he was carrying something in the trunk?
> A. I've encountered that numerous times in my career. Based on the fact he is coming from Tucson; that Trooper Rule said he was nervous; it's a third party car; he's coming on a route that's not the shortest to go to North Carolina, which would be I-40.
> Q. And is there something about not having a key to the trunk that fits into this?
> A. That's correct. In my experience I've never found anybody that didn't have a key to the trunk that didn't have dope in the trunk.

Rec. vol. II, at 37-38.

Trooper Jimerson asked if Defendant had the key to the trunk in his shoes or socks. Defendant stated he did not. The trooper then asked if he could check Defendant's shoes and socks. Defendant agreed. Inside one of Defendant's socks, the troopers uncovered a "meth pipe" with what appeared to be drug residue. The troopers placed Defendant under arrest for violation of the Kansas anti-drug and -paraphernalia laws. After Defendant's arrest, Trooper Rule conducted a canine search of the vehicle. The dog alerted at the trunk and rear seat of the vehicle. The trunk contained 263 pounds of marijuana.

Defendant testified to a somewhat different version of events. Defendant agreed

4

that he consented to a search of his vehicle. Once the troopers failed to uncover a key to the trunk in the interior of the vehicle, however, their tone changed. Defendant testified that he did not consent to Trooper Jimerson's search of his pants pockets. In response, Trooper Jimerson stated: "So if I strip you, you're buck naked on the freeway, a key is not going to fall out of your ass." Rec. Vol. I, at 62. Next, the troopers asked Defendant if he had the key to the trunk in his socks or shoes. Defendant said he did not. Defendant claims Trooper Jimerson ordered Defendant to remove his shoes and socks.[1] Defendant then pulled up his left pant leg, revealing a round cylindrical object. Upon Trooper Jimerson's inquiry, Defendant stated the object was a meth pipe. Defendant testified:

> Q. So you were asked a question what's in your socks?
> A. Yes.
> Q. And then you replied nothing?
> A. Yes.
> Q. And then what was asked of you?
> A. Take off your socks.
> Q. Were you ever asked if you consented to taking your shoes and socks off?
> A. No.
> Q. Based upon those demands, did you comply?
> A. Yes.
> Q. Did you feel like you had a choice?
> A. No
> Q. Did you feel like you were free to leave?
> A. No.

Rec. Vol. I at 63-64.

---

[1] A video camera in the troopers' vehicle recorded the stop, both audibly and visually. At this critical point, however, the audio recording ceased. At the suppression hearing, Trooper Rule testified that while he did not specifically remember intentionally turning off the microphone, he may have done so accidentally. He further testified that the extended period of time without audio recording indicated that the microphone had been turned off.

In his motion to suppress, Defendant unsuccessfully argued (1) the troopers lacked probable cause to stop his vehicle, (2) the scope of the stop was not reasonably tailored to its underlying purpose, and (3) he did not knowingly and voluntarily consent to the search of his socks. Defendant raises the same arguments on appeal.[2] When reviewing a district court's denial of a motion to suppress, we accept the court's findings of fact unless clearly erroneous and consider the evidence in the light most favorable to the Government. United States v. Pena, 143 F.3d 1363, 1365 (10th Cir. 1998). The credibility of witnesses and the weight to be given their testimony is the province of the district court. United States v. Gigley, 213 F.3d 509, 514 (10th Cir. 2000). The ultimate determination of reasonableness under the Fourth Amendment, however, is a question of law which we review de novo. United States v. Lewis, 240 F.3d 866, 871 (10th Cir. 2001).

## A. Traffic Stop

Defendant first argues that Trooper Rule's stop of Defendant's vehicle was unjustified. A traffic stop is "'valid under the Fourth Amendment if the stop is based on an observed traffic violation or if the police officer has reasonable articulable suspicion that a traffic or equipment violation has occurred or is occurring.'" United States v. Bustillos-Munoz, 235 F.3d 505, 512 (10th Cir. 2000) (quoting United States v.

---

[2] Although Defendant may lack standing to object to the search of the vehicle's trunk because he did not prove he had lawful possession of the vehicle, Defendant undoubtedly has standing to object to any unlawful detention of his person. If a detention is illegal, evidence obtained as a result of the detention generally must be excluded under the fruit of the poisonous tree doctrine. See United States v. Villa-Chaparro, 115 F.3d 797, 800 n.1 (10th Cir. 1997).

<u>Botero-Ospina</u>, 71 F.3d 783, 787 (10th Cir.1995) (en banc)).  <u>See also</u> <u>United States v.</u> <u>Whren</u>, 517 U.S. 806, 813 (1996) (holding traffic stop proper if the officer has probable cause to believe a traffic law has been violated, regardless of pretext or ulterior motive on the part of the officer).

In this case, Trooper Rule observed Defendant's vehicle drift to the right side of the lane onto the shoulder, then cross almost to the center lane before straightening out. The trooper issued Defendant a warning citation for violating Kan. Stat. Ann. § 8-1522, which requires a vehicle to be driven "as nearly as practicable entirely within a single lane."  Defendant does not deny his vehicle drifted to the right.  Instead, Defendant claims that under <u>United States v. Gregory</u>, 79 F.3d 973, 978 (10th Cir. 1996), an isolated incident of a vehicle crossing into the emergency lane of a roadway does not justify a traffic stop.

In <u>Gregory</u>, we held that a single occurrence of moving to the right shoulder of the roadway did not justify a traffic stop where the road was winding, the terrain mountainous, and the weather was windy.  <u>Id</u>.  The facts of the present case, however, are more analogous to those in <u>United States v. Ozbirn</u>, 189 F.3d 1194 (10th Cir. 1999).  In <u>Ozbirn</u> we distinguished <u>Gregory</u> and found probable cause justified a traffic stop of a vehicle that drifted onto the shoulder twice within a quarter mile where the weather was sunny and not unusually windy and the road was smooth and dry with only a gentle curve and slight uphill grade.  <u>See also</u> <u>United States v. Dunn</u>, No. 97-3028, 1998 WL 8227 at *1-2 (10th Cir. 1998) (unpublished) (Kansas state trooper had probable cause to believe

7

defendant has committed a traffic violation based on single incident of swerving onto the right shoulder of highway).

Here, Trooper Rule testified that Defendant's vehicle drifted over to the right shoulder then back left where it almost touched the center line before straightening out. Further, the trooper testified that no weather or road conditions could account for the movement. Accordingly, the district court properly concluded that under these circumstances, Trooper Rule had a sufficient basis to stop Defendant's vehicle for a violating Kan. Stat. Ann. § 8-1522.[3]

## B. Scope of Stop

Defendant next argues the scope of the stop exceeded the original justification for the stop. Specifically, Defendant argues Trooper Rule unlawfully detained him in violation of the Fourth Amendment by continuing to question him after returning his driver's license and vehicle registration. "Generally, an investigative detention must 'last no longer than is necessary to effectuate the purpose of the stop.'" United States v. Patten, 183 F.3d 1190, 1193 (10th Cir. 1999) (quoting Florida v. Royer, 460 U.S. 491, 500 (1983)). "When a driver has produced a valid license and proof of entitlement to operate the vehicle, an officer may issue a citation, but then usually must allow the driver

---

[3] In finding that Trooper Rule had probable cause to justify the traffic stop, the district court also relied on the fact that Defendant's license plate was partially obstructed in violation of Kansas law. See Kan. Stat. Ann. § 8-133 ("Every license plate shall at all times be . . . in a place and position to be clearly visible, and shall be maintained free from foreign materials and in a condition to be clearly legible."). We need not reach this issue because we conclude Defendant's violation of Kan. Stat. Ann. § 8-1522 justified the traffic stop.

to proceed without further delay or questioning." Id. Two exceptions to this general rule exist. "An officer may question the driver further if (1) the officer has an objectively reasonable and articulable suspicion that the driver is engaged in illegal activity, or (2) the driver voluntarily consents to further questioning." Id.

Defendant claims the district court did not find the troopers had reasonable suspicion to justify further questioning and suggests the record does not support reasonable suspicion. Such a finding, however, is unnecessary when a driver voluntarily consents to further questioning. Trooper Rule returned Defendant's license and registration, issued him a warning citation, and told Defendant that was all he "had for him." Only then did Trooper Rule request consent to ask further questions. Defendant concedes he voluntarily consented to the questioning, at least to the point where Trooper Jimerson asked to search Defendant's pockets. Because Defendant consented to further questioning, his continued detention after Trooper Rule returned his license and registration did not violate the Fourth Amendment.[4]

---

[4] Defendant relies on United States v. Holt, 229 F.3d 931 (10th Cir. 2000), reh'g en banc granted, Dec. 1, 2000, for the proposition that further questioning of one detained at a traffic stop that is unrelated to the purpose of the stop is not permitted unless the officer has reasonable suspicion of illegal activity. Aplt's Br. at 14. In Holt, we held a highway patrol officer exceeded the reasonable scope of a routine traffic stop for a seat belt violation by questioning the defendant about possession of contraband and weapons. Id. at 940. The questioning in Holt occurred while the officer was writing out a citation, was unrelated to the purpose of the stop, was not prompted by a reasonable suspicion of illegal activity, and was not motivated by safety concerns. Id. Thus, Holt concerned the scope of initial questioning by the officer before the officer had issued any citation, before the officer had returned the driver's license, and before the defendant was free to go. In this case, however, Trooper Rule had returned Defendant's license, issued a citation, and informed Defendant that was all he had before the trooper asked for

(continued...)

9

## C. Consent

Finally, Defendant claims he did not consent to the search of his socks. According to Defendant, the troopers coerced him to remove both his shoes and socks. "Valid consent is that which is 'freely and voluntarily given.'" Pena, 143 F.3d at (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973)). Whether a defendant freely and voluntarily gave consent to a search during a consensual encounter with a police officer is a question of fact to be determined from the totality of the circumstances. Patten, 183 F.3d at 1194 (citing Ohio v. Robinette, 519 U.S. 33, 40 (1996). The Government bears the burden to show that the consent was voluntary. Id. "In determining the scope of a defendant's consent, we ask what a reasonable person would have understood by the exchange between the defendant and police officer." Id.

"In determining voluntariness, we consider whether the consent was 'unequivocal and specific and freely and intelligently given,'" and whether it was given without implied or express duress or coercion. United States v. Mendez, 118 F.3d 1426, 1432 (10th Cir. 1997) (quoting United States v. Angulo- Fernandez, 53 F.3d 1177, 1180 (10th Cir. 1995)). A "coercive show of authority" includes "the presence of more than one officer, the display of a weapon, physical touching by the officer, or his use of a commanding tone of voice indicating that compliance might be compelled." United States v. West, 219 F.3d 1171, 1177 (10th Cir. 2000) (citing United States v. Turner,

---

[4](...continued)
Defendant's consent to further questioning. Accordingly, Holt does not apply to this case.

10

928 F.2d 956, 959 (10th Cir. 1991)).

At the suppression hearing, Both Troopers Rule and Jimerson testified that Defendant consented to the search of his shoes and socks. Defendant, on the other hand, testified that the troopers' tone of voice changed, they searched his pockets without his consent, and then asked him what he had in his socks. According to Defendant, when he replied that he had nothing in his socks, the troopers ordered him to remove his shoes and socks. Defendant further testified that he did not feel free to leave and that he had no choice but to comply with the trooper's demand to remove his socks. The district court concluded:

> Based on this defendant-favorable version of the events, the court finds that defendant was not coerced. Under defendant's version, the troopers made no threats. Even if the court credits defendant's testimony regarding Trooper Jimerson's alleged "strip you naked" remark, defendant does not claim that he believed Trooper Jimerson would carry through or that the remark frightened him. Rather, defendant claims it was that he was coerced by the change in the troopers' tone of voice. He does not describe the change. He does not claim that the troopers yelled at him. The most that the court can infer from defendant's description is that the troopers' tone of voice changed from conversational to serious or commanding. However, if all one of the troopers said was "take off your shoes and socks" in a serious or commanding tone of voice, a reasonable person would have understood that the trooper was merely exerting his authority. According to defendant's testimony, he did not question or object to the order. Instead, he complied, leading to the discovery of the meth pipe.

Rec. Vol. I, Doc. 22, at 14-15 (emphasis added).

While the district court assumed Defendant's version of facts, the court also indicated it believed the troopers were truthful. The district court stated,

> Defendant admitted on cross examination that he was not truthful with the officers and the court would be entitled to take this into consideration in

11

judging the truth of defendant's testimony.  The court has had no previous experience with defendant.  However, Troopers Rule and Jimerson have testified in this court on many occasions.  The court always has found them to be truthful and does so in this case.

Rec. Vol. I, Doc. 22, at 15.

On review, we must accept the district court's findings of fact unless clearly erroneous.  Pena, 143 F.3d at 1365.  If the district court assumed Defendant's version of facts to be accurate, the court's finding that Defendant gave voluntary consent to search his socks appears to be clearly erroneous.  Based on Defendant's version of facts, the troopers issued Defendant a command to remove his socks rather than a request for consent to search.  See West, 219 F.3d at 117 (officer's use of commanding tone of voice indicating that compliance might be compelled can be coercive show of authority).  If, however, the court credited the troopers' testimony as truthful, then the district court properly found Defendant voluntarily consented to the search.  The troopers testified that they requested and received consent from Defendant to search his shoes and socks.  Because the district court based its conclusion that the troopers did not coerce Defendant on Defendant's version of facts, but later concluded the troopers' testimony was truthful, the district court apparently rendered contradictory findings.  Accordingly, we remand that portion of the district court's order which held that based on Defendant's version of events, his consent to allow the troopers to inspect his socks was voluntary, and the district court is to make findings determining which version of events actually occurred, and to enter an order consistent therewith.  See United States v. Ramstad, 219 F.3d 1263, 1265 (10th Cir. 2000) (remanding for further fact-finding where record insufficient to

12

determine suppression issue).

AFFIRMED IN PART and REMANDED for further proceedings consistent with this opinion.

Entered for the Court,


Bobby R. Baldock
Circuit Judge